**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **HARVEY MIGUEL ROBINSON, JR.**<br><br>           **Plaintiff,**<br><br>    v.<br><br>**PENNSYLVANIA DEPARTMENT OF CORRECTIONS, DR. DENISE DANIEL (f/k/a DENISE SMYTH), and NURSE LORI SCHULTZ (f/k/a LORI RIDINGS)**<br><br>           **Defendants.** | **CIVIL ACTION NO. 20-2978** |

**MEMORANDUM OPINION**

**Rufe, J.**                                                                    **March 26, 2024**

Plaintiff Harvey Miguel Robinson, Jr., a prisoner formerly incarcerated at the State

Correctional Institution at Greene ("SCI-Greene"), brings this civil action pursuant to 42 U.S.C.

§ 1983 against Defendants Dr. Denise Daniel (f/k/a Denise Smyth) and Nurse Lori Schultz,

CRNP (f/k/a Lori Ridings) (collectively, the "Medical Defendants"),[1] alleging retaliation in

violation of the First Amendment and deliberate indifference to a serious medical need in

violation of the Eighth Amendment. Robinson also asserts claims under Title II of the Americans

with Disabilities Act and § 504 of the Rehabilitation Act against Defendant Pennsylvania

Department of Corrections ("DOC"). The Medical Defendants and the DOC have each filed

motions for summary judgment. For the reasons set forth below, both motions will be granted in

part and denied in part.

---

[1] For purposes of clarity and consistency with the documents of record, the Court will hereinafter refer to the individual Medical Defendants by their former names, "Denise Smyth" and "Lori Ridings."

## I.    BACKGROUND

### A.  Procedural History

On June 9, 2020, Robinson filed his initial Complaint *pro se*.[2] The Court granted his petition to proceed *in forma pauperis*.[3] On March 31, 2022, the Court entered a Memorandum Opinion and Order granting in part and denying in part the Medical Defendants' motion to dismiss and denying the DOC's motion to dismiss.[4] The parties proceeded with an initial discovery period while Robinson was *pro se*, which ended on September 7, 2022.[5] On November 15, 2022, Robinson obtained court-appointed counsel.[6] Shortly thereafter, Robinson filed a counseled motion to reopen the discovery period, which the Court granted.[7] The second period of fact discovery ended on March 24, 2023.[8]

On April 21, 2023, Robinson filed an Amended Complaint, which incorporated the factual allegations in the initial Complaint and added new claims.[9] The parties filed a joint motion to reopen discovery a third time to address the issues newly raised by the Amended Complaint, which the Court granted.[10] The third period of fact discovery closed on June 20, 2023.[11] Robinson's remaining claims are for retaliation and inadequate medical care under § 1983 against Defendants Nurse Lori Ridings and Dr. Denise Smyth and for disability

---

[2] Compl. [Doc. No. 2].

[3] Order, Feb. 18, 2021 [Doc. No. 8].

[4] *Robinson v. Pa. Dep't of Corr.*, No. 20-2978, 2022 WL 970760 (E.D. Pa. Mar. 31, 2022); Order, Mar. 31, 2022 [Doc. No. 36].

[5] Scheduling Order, June 9, 2022 [Doc. No. 42].

[6] Order, Nov. 15, 2022 [Doc. No. 49].

[7] Pl.'s Mot. Extension Time to Complete Disc. [Doc. No. 50]; Order, Nov. 23, 2022 [Doc. No. 51].

[8] Order, Jan. 18, 2023 [Doc. No. 55].

[9] Am. Compl. [Doc. No. 60].

[10] Mot. Extension Time to Complete Disc. [Doc. No. 63]; Order, May 8, 2023 [Doc. No. 64].

[11] Order, May 8, 2023 [Doc. No. 64].

discrimination under the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA") against the DOC.[12] The Medical Defendants and the DOC have each filed motions for summary judgment, which have been fully briefed and are now ripe for disposition.[13]

### B. Relevant Facts[14]

At all times relevant, Plaintiff Harvey Miguel Robinson, Jr. was incarcerated at SCI-Greene.[15] He testified at his deposition that he started having "spinal problems" after he was assaulted in 2006 by three guards.[16] He further testified that, in 2009, the DOC began providing him with a wheelchair at his request.[17] In March 2010, he underwent surgery on his neck at Altoona Regional Hospital.[18] Robinson continued to use the wheelchair until the events giving rise to this lawsuit.[19] He testified that he needed the wheelchair due to compression on his sciatic nerve caused by stenosis in his lower back, prior lower extremity injuries, and the injury to his neck, all of which led to him being unable to walk unassisted.[20] He also received prescriptions for a variety of pain medications throughout the following years, including Ultram, a narcotic.[21]

---

[12] On June 7, 2023, Plaintiff voluntarily dismissed his claim against Wellpath, LLC, the private healthcare company which contracts with the DOC to provide medical services at its facilities and employed the Medical Defendants during the relevant period. Stipulation and Order [Doc. No. 69].

[13] Med. Defs.' Mot. Summ. J. [Doc. No. 73-2]; DOC's Mot. Summ. J. [Doc. No. 74].

[14] The parties did not submit a joint stipulation of material facts. Instead, Plaintiff filed a "Statement of Uncontested & Contested Facts," Doc. No. 76-1 [hereinafter Pl.'s SOF], the Medical Defendants filed their own "Concise Statement of Material Facts," Doc. No. 73-3, and the DOC submitted only the "Material Facts" section in its brief in support of summary judgment. As Plaintiff is the non-moving party, the Court draws the factual background from the uncontested section of Plaintiff's statement of facts and the documents of record, with all inferences drawn in a light most favorable to Plaintiff. Fed. R. Civ. P. 56(a).

[15] Pl.'s SOF at 1 ¶ 1 [Doc. No. 76-1].

[16] Pl.'s Resp. Opp'n Med. Defs.' Mot. Summ. J., Ex. 6, Robinson Dep. Tr. 22:7–11 [Doc. No. 76-6].

[17] *Id.* at 28:25–29:12; *id.* at 104:12–19.

[18] *Id.* at 22:16–23:3; Med. Defs.' Mot. Summ. J., Ex. A, at 286 [Doc. No. 73-4] (records from Allegheny Brain and Spine Surgeons reflecting "fusion at C4–5" on March 4, 2010).

[19] Pl.'s SOF at 1 ¶ 2 [Doc. No. 76-1].

[20] Pl.'s Resp. Opp'n Med. Defs.' Mot. Summ. J., Ex. 6, Robinson Dep. Tr. 100:4–13 [Doc. No. 76-6].

[21] *See generally* Med. Defs.' Mot. Summ. J., Ex. A [Doc. Nos. 73-4, 73-5] (Robinson medical record).

In May 2017, Robinson filed at least two administrative grievances against the medical staff at SCI-Greene. The first was against Defendants Dr. Smyth and Nurse Ridings, alleging that they were refusing to forward Robinson's MRI results to a neurosurgeon he was scheduled to see.[22] The second was against Nurse Ridings and "Mr. Hice" for allegedly denying him certain medication cream, shampoo, and lotion, which he stated was necessary to treat his dermatitis.[23] During this time, Robinson also communicated frequently with the medical staff to complain about the quality of medical care he was receiving.[24]

    1.  <u>Appointment with Neurosurgeon and Follow-Up Visits at SCI-Greene</u>

On July 5, 2017, Robinson had an appointment with Dr. James Wilberger, an outside neurosurgeon, due to complaints of constant pain in his lower back.[25] Dr. Wilberger's notes state as follows:

> On palpation it is in the vicinity of about L3. He also complains of constant numbness and tingling in his legs with the right side more affected than the left. After questioning him several times there is no good indication that he is experiencing significant pain in his legs[.] . . . He indicated that the present symptoms have been going on for 3 years. Except for pain medications he says he has had no specific treatment of any type. . . .
>
> [A]n MRI of the lumbar spine was performed in the March of this year. It shows normal alignment. There is very mild stenosis at L4–5. No disc herniations or other abnormality. . . . Plan[:] there is no indication for neurosurgical intervention. *This should be treated conservatively with physical therapy anti-inflammatory medications and possibly lumbar epidural steroid injections.*[26]

---

[22] Pl.'s Resp. Opp'n Med. Defs.' Mot. Summ. J., Ex. 2, at 1 [Doc. No. 76-2] (Grievance #677566, dated 5/11/2017).

[23] *Id.* at 2 (Grievance #677568, dated 5/11/2017).

[24] Pl.'s SOF at 2 ¶ 4 [Doc. No. 76-1].

[25] Pl.'s Resp. Opp'n Med. Defs.' Mot. Summ. J., Ex. 8, at 1–3 [Doc. No. 76-8] (neurosurgeon's notes from July 5, 2017 appointment). Robinson's medical records indicate that he first inquired about seeing a neurosurgeon or neurologist on or about December 7, 2016. Med. Defs.' Mot. Summ. J., Ex. A, at 31 [Doc. No. 73-4].

[26] Pl.'s Resp. Opp'n Med. Defs.' Mot. Summ. J., Ex. 8, at 1–3 [Doc. No. 76-8] (emphasis added).

Under the Patient Education section of his notes, Dr. Wilberger further wrote: "I would strongly recommend the use of an anti-inflammatory medication some physical therapy and if still says complaining of present symptoms lumbar epidural steroid injections[.]"[27]

Over the following months, Robinson had additional appointments with health care providers back at SCI-Greene. For example, Robinson's medical record indicates that he had a sick call appointment with Nurse Ridings on July 17, 2017, during which he asked about the neurosurgeon's recommendations.[28] Nurse Ridings wrote that the neurosurgeon's recommendations were NSAIDs (non-steroidal anti-inflammatory drugs) and physical therapy, that Robinson was "not pleased [with] this answer," and that she was declining to renew Robinson's previous prescription for Ultram.[29] Another handwritten note indicates that Robinson told a nurse later on July 17, "Oh no you are going to bring me for my meds. I'm suing you . . . . This is crazy."[30] That day, Robinson filed a grievance against Dr. Smyth, "Mr. Hice," and "PAC Auston" "for purposely denying me the pain med's [sic] I've been getting . . . ."[31]

Robinson's medical records reflect several more appointments and interactions with health care providers throughout August and September 2017, including sessions with John Kushner, a physical therapist.[32] Kushner wrote in his notes from an appointment on August 24, 2017 that Robinson was reporting episodic pain in his right leg but demonstrated "no facial

---

[27] *Id.* at 5 (MyChart Visit Summary from Allegheny Health Network).

[28] Med. Defs.' Mot. Summ. J., Ex. A, at 13 [Doc. No. 73-4] (handwritten notes stamped with Nurse Riding's name, dated July 17, 2017).

[29] *Id.*

[30] *Id.*

[31] Med. Defs.' Mot. Summ. J., Ex. E, at 5 [Doc. No. 73-9] (Grievance #687101). This grievance received an initial review response, was appealed to the Facility Manager, and was then denied by final decision from the DOC Secretary's Office of Inmate Grievances and Appeals ("SOIGA") on December 13, 2017. *Id.* at 1.

[32] Med. Defs.' Mot. Summ. J., Ex. A, at 11–12, 311–16 [Doc. No. 73-4].

grimacing indicating limited by pain," with "several inconsistencies during eval . . . ."[33] Kushner's notes from a follow-up appointment on September 21, 2017 state that Robinson reported frequent falls when walking, but Robinson's "minimal effort" during testing made it "hard to get [an] accurate assessment of" the strength in his right leg.[34]

### 2. Discontinuation of Wheelchair Access

On October 6, 2017, correctional officers at SCI-Greene, including Sergeant Jenkins,[35] took Robinson's wheelchair at the direction of Nurse Ridings, who in turn had consulted with Dr. Smyth, her direct supervisor.[36] Robinson contends he was not given a cane or other mobility device to replace the wheelchair.[37] However, the Physician's Order Form discontinuing the wheelchair use (as approved by Nurse Ridings) indicated that a cane would be issued.[38]

According to appointment notes from Dr. Smyth on October 10, 2017, Robinson stated that "he can't use a cane [and] needs his [wheelchair] back," he asked for "T4/T3 [Tylenol #4] instead of Ultram," and stated that "NSAIDs do not help [with] his pain."[39] Dr. Smyth discussed with Robinson the possibility of "increased weakness from inactivity" and she told him that she didn't "feel a [wheelchair] helps him [and] could make him weaker."[40] Dr. Smyth also noted her observations that Robinson was "[u]p in cell standing [without] problem."[41]

---

[33] *Id.* at 316.

[34] *Id.* at 313.

[35] DOC's Reply Supp. Mot. Summ. J. at 5 [Doc. No. 80].

[36] Pl.'s SOF at 2 ¶ 6 [Doc. No. 76-1].

[37] *Id.* at 2 ¶ 7.

[38] Med. Defs.' Mot. Summ. J., Ex. A, at 352 [Doc. No. 73-4] (Physician's Order Form dated October 6, 2017 from Nurse Ridings stating, "DC wheelchair, issue cane"); *id.* at 341 (form titled "Release from Responsibility for Medical Treatment" regarding Robinson's refusal to use a cane, but noting he had "ref[used] to sign" the form).

[39] *Id.* at 10.

[40] *Id.*

[41] *Id.*

In a grievance Robinson filed on October 24, 2017, he stated that he reminded Sergeant Jenkins that he "absolutely can not use a cane because of the nerve damage in [his] arms," and Sergeant Jenkins responded that "he knows that, but medical said [Robinson was] not approved for a wheel chair and he can not give [him] one."[42] Robinson contends "that he had no access to pain medication (NSAIDs or non-NSAIDs) . . . for at least portions of this time, and that he suffered constant and excruciating pain as a result."[43] In additional notes from a sick call appointment dated November 2, 2017, Nurse Ridings indicated that Robinson told her, "You are going to renew my Ultram and T4, the court will make you."[44] Nurse Ridings wrote that Robinson "was walking without apparent difficulty . . . but changed gait when he saw me" and was "very argumentative, threatening lawsuit."[45]

On the afternoon of November 7, 2017, Nurse Jodi Borchert wrote that Robinson "voice[d] concerns re need for [wheelchair]," and, although she noted that there were no immediate medical concerns at that time, her assessment indicated a potential "risk of fall[.]"[46] Two days later, another RN, Nurse Zebley, wrote that Robinson had been "seen for triage" because of a "fall" leading to "[l]eft knee pain."[47] Robinson had a follow-up appointment with a physician assistant the next day, who noted that Robinson "would not get out of bed," he was

---

[42] DOC's Mot. Summ. J., Ex. E, at 2 [Doc. No. 74-3] (Grievance #703294). This grievance was also pursued through every available round of appellate review within the DOC, concluding in a final denial of relief from SOIGA on March 8, 2018. *Id.* at 1.

[43] Pl.'s SOF at 3 ¶ 2 [Doc. No. 76-1] (listed under "Contested Facts," while acknowledging Medical Defendants' position that NSAIDs were available to Robinson for purchase from the commissary and Robinson had access to non-NSAID pain medications for portions of time during the six-month period).

[44] Med. Defs.' Mot. Summ. J., Ex. A, at 10 [Doc. No. 73-4].

[45] *Id.*

[46] *Id.* at 8.

[47] *Id.*

suffering from left knee pain, and an X-ray had been ordered.[48] The X-ray results, dated November 13, 2017, found "mild degenerative changes with narrowing of the medial joint space with soft tissue swelling and a joint effusion," but "no fracture or dislocation."[49] Dr. Smyth reviewed the X-ray results the next day.[50]

### 3. Declarations from Other Inmates

Two fellow inmates at SCI-Greene have entered sworn declarations describing their observations from when the wheelchair was taken and how they perceived the impact on Robinson over the following months. One declarant, Jose Busanet, states that he overheard Nurse Ridings tell at least one correctional officer and a sergeant "that they were taking Harvey's wheelchair and pain medications away to 'teach him a lesson' for filing grievances against the medical staff," and "something to the effect of: 'Let him file a grievance about that,'" to which the sergeant responded, "Fuck him. Let's go get it."[51] Busanet further recalls three incidents demonstrating the difficulties Robinson faced without his wheelchair: (1) on one occasion, Busanet heard Robinson fall and scream out in pain while he was attempting to go to the bathroom; (2) on another occasion, Busanet saw that Robinson could not move himself to the toilet and had defecated on himself in his cell, but when Busanet notified a correctional officer, Busanet was told to "Stay out of it"; and (3) Busanet saw Robinson collapse, scream for help, and call out that his back was hurting on his way to the prison yard, but correctional officers did not respond until after Robinson had been lying on the ground for about 15 to 20 minutes.[52]

---

[48] *Id.* at 5.

[49] *Id.* at 344.

[50] *Id.* at 5.

[51] Pl.'s Resp. Opp'n Med. Defs.' Mot. Summ. J., Ex. 5, at 1 [Doc. No. 76-5] (Declaration of Jose Busanet).

[52] *Id.* at 2–3.

Another declarant, Darien Houser, similarly states that he heard Nurse Ridings tell Robinson in the presence of at least two correctional officers "that they were coming to take his wheelchair because he was filing too many grievances against the medical staff . . . ."[53] Like Busanet, Houser recalls an incident where Robinson fell while attempting to walk toward the prison yard, but "[n]one of the guards helped him up," they "made him crawl," and "stood there laughing at him."[54] Houser states that he heard Robinson "constantly" complaining about his pain, but when Houser tried to raise the situation with Sergeant Jenkins, a member of the correctional staff, Jenkins responded with "something along the lines of 'that's what he gets,' or 'he complains too much,' or simply that 'he's filing too many grievances.'"[55] When Houser tried talking to Dr. Smyth about the issue, "she brushed [Houser] off," said that it wasn't her call, and conveyed "that her 'supervisor' had made the decision."[56] Finally, Houser recalls speaking with another staff member, Sergeant Nelson, who responded, "F--- him. He complains too much."[57]

### 4.  Return of Wheelchair

On April 4, 2018, a nurse wrote in Robinson's progress notes that he "was walking to the shower when he lowered himself to the floor" and said, "This is why I need a wheel chair."[58] On April 5, 2018, approximately six months after Robinson's wheelchair was taken away, Dr. Smyth restored Robinson's access to a wheelchair for 60 days pending the results of an EMG test.[59] On June 12, 2018, after the EMG test had been conducted, Robinson's use of a wheelchair

---

[53] Pl.'s Resp. Opp'n Med. Defs.' Mot. Summ. J., Ex. 4, at 1 [Doc. No. 76-4] (Declaration of Darien Houser).

[54] *Id.* at 2.

[55] *Id.* at 2–3.

[56] *Id.* at 3.

[57] *Id.*

[58] Med. Defs.' Mot. Summ. J., Ex. A, at 140 [Doc. No. 73-4].

[59] Pl.'s SOF at 2 ¶ 9 [Doc. No. 76-1]; Med. Defs.' Mot. Summ. J., Ex. A, at 274 [Doc. No. 73-4] (Health Care Item Receipt dated April 5, 2018, temporarily authorizing wheelchair use until June 5, 2018); *id.* at 135 (notes from

was renewed on a more permanent basis by another physician, Dr. Abney, per assessment findings that Robinson "was unable to walk any distance [without] assistance," which "necessitates his need for a wheelchair."[60] Dr. Abney observed that the EMG findings were negative as to the lumbar spine "but suggestive of ACDF [anterior cervical discectomy and fusion] as potential etiology of his current symptomatology," with a note that Robinson had a "significant [history] of cervical degenerative disease [with] an ACDF shown on 2007 MRI."[61] From that point on, Robinson has continued to use a wheelchair daily.[62]

## II.  STANDARD OF REVIEW

A court will award summary judgment on a claim or part of a claim where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[63] A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.[64] A dispute is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."[65] In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[66] Further, a court may not weigh the evidence or make

---

Dr. Denise Daniel (f/k/a Denise Smyth) during April 5, 2018 appointment stating that Robinson "was trying to walk to the yard and says that his legs went numb," he "[d]oes have a history of surgery on the c-spine," he "did have a wheelchair in the past but this was discontinued after he was seen by the neurosurgeon," and he "will be allowed to use wheelchair until EMG is completed," but "if there are no findings on the EMG to correlate with the weakness, the wheelchair will be discontinued").

[60] Med. Defs.' Mot. Summ. J., Ex. A, at 110 [Doc. No. 73-4] (notes from "Dr. Abney" on June 12, 2018, after EMG was conducted, stating that "[a]t present [Robinson] will remain in wheelchair and will be followed routinely").

[61] *Id.*

[62] Pl.'s SOF at 2 ¶ 10 [Doc. No. 76-1].

[63] Fed. R. Civ. P. 56(a).

[64] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[65] *Id.*

[66] *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citation omitted).

credibility determinations.[67] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[68] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[69] Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[70]

## III. DISCUSSION

### A. Count II: Eighth Amendment Deprivation of Adequate Medical Care

#### 1. Legal Standard

"Section 1983, enacted as part of the Civil Rights Act of 1871, establishes a federal remedy against a person who, acting under color of state law, deprives another of constitutional rights."[71] The Eighth Amendment prohibits the infliction of cruel and unusual punishment.[72] That prohibition imposes a requirement on prison officials to provide humane conditions of confinement, including adequate medical care.[73] Therefore, the Supreme Court has established that prison officials violate the Eighth Amendment when they act deliberately indifferent to a prisoner's serious medical needs.[74] Courts have applied this standard as a two-part framework: A

---

[67] *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[68] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[69] *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

[70] *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[71] *Burella v. City of Philadelphia*, 501 F.3d 134, 139 (3d Cir. 2007) (quotation marks and citations omitted) (quoting *McCurdy v. Dodd*, 352 F.3d 820, 825 (3d Cir. 2003)). The Medical Defendants do not dispute that they were acting under color of state law. Therefore, the Court's inquiry is limited to determining whether Robinson was deprived of a constitutional right.

[72] U.S. Const. amend. VIII.

[73] *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

[74] *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

plaintiff bringing a medical needs claim must show (1) that the defendants were deliberately indifferent to his medical needs, and (2) that those needs were serious.[75] A medical need is serious if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."[76]

Where, as here, a plaintiff challenges the adequacy of medical care he received (as distinct from treatment that was delayed or denied),[77] "there are two very distinct subcomponents to the deliberate indifference prong . . . ."[78] First, the plaintiff must make an objective showing that the medical care he received was inadequate.[79] Second, he must make a subjective showing that the individual defendant acted with a culpable state of mind, which, "like any other form of scienter, [can] be proven through circumstantial evidence and witness testimony."[80] Applying those components to the summary judgment context, "a plaintiff can proceed to trial on an adequacy of care claim when there is a genuine issue of fact regarding both the adequacy of care and the defendant's intent."[81]

As to objective inadequacy, a plaintiff who has received some amount of treatment typically faces a high bar because "prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners,"[82] and treatment decisions made by medical professionals

---

[75] *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017).

[76] *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citation omitted).

[77] *See U.S. ex rel. Walker v. Fayette County*, 599 F.2d 573, 575 n.2 (3d Cir. 1979) (distinguishing "cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment").

[78] *Pearson*, 850 F.3d at 536.

[79] *Id.*

[80] *Id.* at 535 (citing *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993)).

[81] *Id.* at 537 (citing *Durmer*, 991 F.2d at 69 n.13).

[82] *Durmer*, 991 F.2d at 67 (citing *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)).

are "presumptively valid . . . ."[83] However, the presumption of adequacy may be defeated by showing "that the medical official did not exercise professional judgment."[84] A plaintiff may, for example, present evidence that the treatment provided "was 'a substantial departure from accepted professional judgment, practice, or standards' such that a reasonable jury could conclude that [the provider] 'actually did not base [her] decision on such judgment.'"[85]

As to the subjective scienter requirement, an Eighth Amendment medical needs claim is, at its heart, one that seeks to remediate "the 'unnecessary and wanton infliction of pain.'"[86] "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment . . . ."[87] The common-law tort of medical malpractice is not actionable as a constitutional claim.[88] Rather, "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . . ."[89]

### 2. Application

The Medical Defendants contend that Robinson received "considerable, thorough, and ongoing medical treatment from medical providers," including "being scheduled for various diagnostic tests, clinical examinations, prescription of medication, and specialty care when

---

[83] *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982).

[84] *Pearson*, 850 F.3d at 536.

[85] *Id.* at 539 (quoting *Youngberg*, 457 U.S. at 323).

[86] *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion)).

[87] *Estelle*, 429 U.S. at 106.

[88] *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004); *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("Deliberate indifference to a prisoner's serious medical needs can give rise to . . . a constitutional violation; however, mere medical malpractice will not." (citing *Estelle*, 429 U.S. at 106)).

[89] *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

needed."[90] The Medical Defendants concede that "Robinson was previously provided a wheelchair and Ultram prior to 2017," but they assert that they adjusted their position based on their reasoned medical judgment, citing the findings from the outside neurosurgeon, the skepticism of Robinson's physical therapist, and Dr. Smyth's documented concerns that continued use of the wheelchair could lead to increased weakness.[91] In short, the Medical Defendants contend, "[t]he wheelchair and Ultram were discontinued simply because there was no medical need for them . . . ."[92]

Robinson has responded with sworn declarations from two witnesses.[93] Those declarations create a genuine dispute about the motivations behind the Medical Defendants' decisions (*i.e.*, the subjective component of deliberate indifference). Viewing the evidence in the light most favorable to Robinson—including Nurse Ridings's alleged statements to other correctional staff that she wanted to "teach [Robinson] a lesson"[94] and was taking away his wheelchair and pain medications "because he was filing too many grievances"[95]—a jury could reasonably conclude that Nurse Ridings acted with the obduracy and wantonness sufficient to establish deliberate indifference.[96] Moreover, because Nurse Ridings operated directly under the supervision of Dr. Smyth, only the latter of whom had the final authority to adjust Robinson's

---

[90] Med. Defs.' Mot. Summ. J. at 15 [Doc. No. 73-2].

[91] *Id.* at 16.

[92] *Id.* at 16–17.

[93] Pl.'s Resp. Opp'n Med. Defs.' Mot. Summ. J., Ex. 5, at 1 [Doc. No. 76-5] (Declaration of Jose Busanet); Pl.'s Resp. Opp'n Med. Defs.' Mot. Summ. J., Ex. 4, at 2 [Doc. No. 76-4] (Declaration of Darien Houser).

[94] Pl.'s Resp. Opp'n Med. Defs.' Mot. Summ. J., Ex. 5, at 1 [Doc. No. 76-5] (Declaration of Jose Busanet).

[95] Pl.'s Resp. Opp'n Med. Defs.' Mot. Summ. J., Ex. 4, at 1 [Doc. No. 76-4] (Declaration of Darien Houser).

[96] The Medical Defendants contend that "there is no *credible* evidence to support [Robinson's] belief" that the discontinuation of his wheelchair access was driven by personal animus. Med. Defs.' Mot. Summ. J. at 21 [Doc. No. 73-2] (emphasis added). That is not the standard courts apply on a motion for summary judgment. The Medical Defendants have not shown that the declarations are merely colorable or are not significantly probative.

treatment plan, a jury could reasonably attribute Robinson's evidence of an alleged improper and non-medical motive to Dr. Smyth.

However, Robinson must do more than point to evidence of a culpable state of mind. He must show that there is a genuine factual dispute as to whether his medical needs were serious under the second prong of the *Estelle v. Gamble* framework.[97] Moreover, because this is an adequacy of care claim and not a denial or delay of care claim, Robinson must also make an objective showing that the treatment he received was inadequate. Reviewing the present evidence and drawing all inferences in a light most favorable to Robinson, the Court concludes that there is a genuine dispute of material fact regarding whether the discontinuation of Robinson's wheelchair access was adequate medical treatment and whether his inability to walk was a serious medical need, but there is not a triable dispute as to the adequacy of the Medical Defendants' decision to discontinue Ultram, Tylenol #4, or other narcotic pain medications.

Robinson has not presented medical expert testimony, but the Third Circuit has explained that "expert testimony 'is not necessarily required' where other forms of extrinsic proof may suffice."[98] "Indeed, expert testimony is not admissible, let alone required to create a genuine issue of fact as to whether the care the prisoner received was adequate, if it was obvious to the jury that the care violated professional standards."[99] For that reason, the Third Circuit held in *Pearson v. Prison Health Service* that laypersons on a jury could reasonably conclude, without expert testimony, that a nurse who "forc[ed] a screaming patient to crawl to a wheelchair

---

[97] 429 U.S. at 104–05.

[98] *Pearson*, 850 F.3d at 536 (quoting *Brightwell v. Lehman*, 637 F.3d 187, 194 n.8 (3d Cir. 2011)).

[99] *Pearson*, 850 F.3d at 537 n.3 (citing *Calhoun v. Yamaha Motor Corp. U.S.A.*, 350 F.3d 316, 320–21 (3d Cir. 2003)).

violate[d] professional standards of care," and could further conclude that the nurse knew the patient inmate "could not walk and deliberately failed to assist him for non-medical reasons."[100]

Here, the Medical Defendants do not contest that Robinson was authorized to use a wheelchair before October 6, 2017 or that Robinson's wheelchair was returned to him on April 5, 2018—first, on a temporary basis by Dr. Smyth, and, immediately thereafter, on an ongoing basis by another physician. Nor do the Medical Defendants challenge Robinson's assertion that he continues to use a wheelchair daily to the present day. The fact that Robinson was granted access to a wheelchair for years-long stretches before and after the six-month period at issue belies the Medical Defendants' position that there was no medical need for one. Moreover, the medical records demonstrate that at least one provider not named in this action recognized that Robinson faced a risk of falling once the wheelchair was taken away—a risk which came to fruition two days later based on record evidence that Robinson fell on his way to the yard, leading to a knee injury that required an X-ray.

Those facts, in combination with several witnesses' declarations stating that it was well-known throughout SCI-Greene (including among its staff) that Robinson had trouble walking without assistance, raise a genuine dispute about whether taking the wheelchair away was a substantial departure from accepted professional judgment, practice, or standards.[101] For the same reasons, the Court holds that a reasonable jury could find that Robinson's medical needs

---

[100] *Pearson*, 850 F.3d at 537.

[101] The Court notes that there is a separate factual dispute between the parties over whether Robinson was offered a cane as a replacement assistive device and whether a cane was sufficient to meet Robinson's needs. Given Robinson's contention that he could not use a cane due to nerve damage in his hands—which is corroborated by his deposition testimony and statements he made in contemporaneous administrative grievances he filed—the Court similarly holds that this genuine factual dispute is most appropriate for the jury to resolve. *See* Pl.'s Resp. Opp'n Med. Defs.' Mot. Summ. J., Ex. 6, Robinson Dep. Tr. 60:21–61:15 [Doc. No. 76-6].

were serious. The inability to walk without assistance is an obvious medical need that a lay

person could easily recognize and understand.[102]

Finally, the Medical Defendants cite the recommendations of Dr. Wilberger, an outside

neurosurgeon, as supporting their position that their treatment decisions were adequate and based

on objective medical judgment. That argument is persuasive only with respect to the medications

that Robinson was prescribed, not the discontinuation of the wheelchair. Dr. Wilberger

concluded based on his examination that Robinson "should be treated conservatively with

physical therapy[,] anti-inflammatory medications[,] and possibly lumbar epidural steroid

injections."[103] Dr. Wilberger said nothing about the use of a wheelchair or other assistive

devices. However, his recommendations can be read to state that other pain medications, like

narcotics, were not medically necessary. Of note, numerous providers back at SCI-Greene,

including several non-parties to this case, had appointments with Robinson during the relevant

period and reached the same conclusion that prescriptions for Ultram or other narcotics were not

medically necessary. Indeed, PA Stephen Kaminsky wrote on November 29, 2017 that Robinson

had "already [been] seen by 2 MD's" and appeared to be "doctor shopping for Ultram."[104]

Courts in the Third Circuit have repeatedly held that an "inmate's objection to the type of

medication provided by prison physicians" does not amount to deliberate indifference where

alternative medications were provided.[105] Although Robinson asserts that he was denied access

---

[102] *See also* Med. Defs.' Mot. Summ. J., Ex. A, at 110 [Doc. No. 73-4] (notes from Dr. Abney reauthorizing Robinson's wheelchair use on June 12, 2018 while describing his "significant [history] of cervical degenerative disease" and diagnosing potential anterior cervical discectomy and fusion based on the results of his EMG test).

[103] Pl.'s Resp. Opp'n Med. Defs.' Mot. Summ. J., Ex. 8, at 1–3 [Doc. No. 76-8].

[104] Med. Defs.' Mot. Summ. J., Ex. A, at 6 [Doc. No. 73-4].

[105] *Crowe v. Maxa*, No. 16-175, 2019 WL 4101236, at *4 (W.D. Pa. Aug. 29, 2019); *see also, e.g.*, *Wisniewski v. Frommer*, 751 F. App'x 192, 193–96 (3d Cir. 2018) (affirming dismissal of a plaintiff's § 1983 claim where medical prison staff stopped prescribing an opioid pain medication and advised the plaintiff to purchase Motrin from the prison commissary); *Talbert v. Corr. Dental Assocs.*, No. 18-5112, 2020 WL 890212, at *6 (E.D. Pa. Feb. 21, 2020)

to *any* pain medications during the relevant period—NSAIDs or otherwise—he cites no evidence in the record in support of that contention, which is contradicted by medical records showing ongoing prescriptions for non-narcotic pain medications during the period at issue.[106] Accordingly, the Court grants the Medical Defendants' motion for summary judgment on Robinson's Eighth Amendment claim solely with respect to their decisions to prescribe pain medications other than Ultram, Tylenol #4, or other narcotic pain medications. However, for the reasons previously stated, the Court will deny summary judgment on Robinson's adequacy of care claim under the Eighth Amendment regarding the discontinuation of his wheelchair access.

### B. Count I: First Amendment Retaliation

Robinson also brings a retaliation claim against the Medical Defendants under § 1983. He contends that the taking of his wheelchair and the withholding of effective pain medications were retaliation for grievances he had filed, as well as other oral complaints he had made about the quality of care he was receiving. The Medical Defendants respond that they are entitled to summary judgment because there is no genuine dispute that their decisions were motivated by proper medical judgment rather than retaliatory animus.

The First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in constitutionally protected speech.[107] "Official retaliation for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the

---

(holding that prisoner's belief that he should have been treated with stronger pain medication than he was given amounted to a "mere disagreement as to the proper medical treatment [needed]").

[106] Med. Defs.' Mot. Summ. J., Ex. A, at 400–33 [Doc. No. 73-5] (records from Sapphire eMAR, the DOC's electronic health record platform, reflecting active prescriptions from October 2017 to April 2018 for drugs including carbamazepine, diclofenac, and gabapentin).

[107] *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out . . . ." (citing *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972))).

protected right.'"[108] A plaintiff bringing a First Amendment retaliation claim must establish "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action."[109]

An inmate who files a grievance has engaged in protected speech.[110] Oral complaints against prison staff are also protected expression. Rather than challenging the protected nature of Robinson's speech, the Medical Defendants instead cite their own deposition testimony stating that they were unaware of the grievances filed against them.[111] In other words, the Medical Defendants contend that because they did not know about Robinson's complaints, he cannot show a causal connection between the protected speech and the allegedly retaliatory conduct.

To the contrary, the cited portions of the deposition transcripts indicate that Dr. Smyth and Nurse Ridings merely could not *recall* learning about Robinson's grievances against them (as distinguishable from their testimony about their general practices surrounding inmate grievances).[112] Moreover, Robinson again cites the sworn declarations from two other inmates who overheard statements from Nurse Ridings which not only suggest that she knew about the grievances, but also that she made the decision to take Robinson's wheelchair (under the

---

[108] *Starnes v. Butler Cnty. Ct. Com. Pl.*, 971 F.3d 416, 429 (3d Cir. 2020) (quoting *Hartman*, 547 U.S. at 256).

[109] *Mirabella v. Villard*, 853 F.3d 641, 649 (3d Cir. 2017) (quoting *Thomas v. Independence Township*, 463 F.3d 285, 296 (3d Cir. 2006)).

[110] *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (noting that the filing of a grievance by an inmate "implicate[s] conduct protected by the First Amendment" (quoting *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003))).

[111] Med. Defs.' Mot. Summ. J. at 22 [Doc. No. 73-2] (citing Med. Defs.' Mot. Summ. J., Ex. C, Smyth Dep. Tr. 9:1–4 [Doc. No. 73-7]; Med. Defs.' Mot. Summ. J., Ex. D, Ridings Dep. Tr. 15:3–13 [Doc. No. 73-8]).

[112] *See* Med. Defs.' Mot. Summ. J., Ex. C, Smyth Dep. Tr. 9:4–8 [Doc. No. 73-7] ("Q. . . . [D]o you recall them ever mentioning anything to you about [grievances filed by] Mr. Robinson? A. Like I said, that was six years ago. I do not recall."); Med. Defs.' Mot. Summ. J., Ex. D, Ridings Dep. Tr. 15:8–15 [Doc. No 73-8] ("Q. . . . Would there have been times where on occasion you may not even become aware that a grievance had been filed against you? A. Multiple times. Q. Do you recall if that happened in this instance? A. I do not recall.").

supervision and authorization of Dr. Smyth) because of the grievances.[113] This evidence creates a triable issue of fact under the causation prong of Robinson's retaliation claim.

The Medical Defendants further contend that there is no dispute over whether an adverse action was taken against Robinson.[114] They assert that the treatment Robinson received was objectively reasonable, and medically appropriate treatment cannot be considered "adverse" for purposes of a First Amendment retaliation claim. Upon review of the present record, the Court agrees, but only with respect to the Medical Defendants' (and other non-party providers') decisions to prescribe Robinson certain medications over others. As previously stated, Robinson has not identified evidence supporting his claim that the Medical Defendants withheld all pain medications (regardless of type) during the relevant period.[115] To the extent that the physicians at SCI-Greene did not give Robinson the specific pain medications he wanted, such prescribing decisions cannot constitute an adverse action, barring evidence that the providers knew the medications they prescribed were ineffective. Robinson has not presented sufficient evidence to create a genuine dispute on this point. Accordingly, the Court will grant the Medical Defendants' motion for summary judgment on Robinson's retaliation claim based on the alleged withholding or refusal to prescribe certain pain medications.

By contrast, the Medical Defendants cannot appeal to medical appropriateness with respect to the taking of Robinson's wheelchair. The Court has already concluded, in its analysis regarding Robinson's Eighth Amendment claim, that there is a genuine dispute as to whether Robinson's medical needs (his back pain and inability to walk) were serious, and whether the

---

[113] Pl.'s Resp. Opp'n Med. Defs.' Mot. Summ. J., Ex. 5, at 1 [Doc. No. 76-5] (Declaration of Jose Busanet); Pl.'s Resp. Opp'n Med. Defs.' Mot. Summ. J., Ex. 4, at 2 [Doc. No. 76-4] (Declaration of Darien Houser).

[114] Med. Defs.' Mot. Summ. J. at 22 [Doc. No. 73-2].

[115] *See supra* Section III.A.2.

withholding of his wheelchair was adequate medical treatment.[116] Applying those conclusions to Robinson's retaliation claim, the question a jury would be required to address under the "adverse action" prong is an objective one: Would taking a wheelchair away from a person of ordinary firmness deter him from exercising his constitutional rights where, as here, he cannot walk without assistance? The Court holds that a reasonable jury could resolve that question in Robinson's favor.[117] The Medical Defendants' motion for summary judgment will be denied on Robinson's retaliation claim based on the taking of his wheelchair.

### C.  Count III: ADA and § 504 of the Rehabilitation Act

Robinson asserts that the DOC violated the ADA and RA by taking his wheelchair. He also contends that the DOC violated the ADA by implementing a deficient accommodation policy which fails to require DOC personnel to submit accommodation request forms on inmates' behalf and fails to specify the circumstances under which DOC staff would be required to submit such request forms.

Title II of the ADA[118] provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."[119] The ADA covers state prisons.[120] The RA, which is interpreted the same as the ADA,

---

[116] *Id.*

[117] The Court makes a necessary point of clarification: The record reflects that Robinson continued to file grievances after his wheelchair was taken away. That does not necessarily defeat his ability to prove the adverse action prong. A First Amendment retaliation claim requires an objective showing of deterrence—viewed from the perspective of a person of ordinary firmness—and not a subjective inquiry into whether Robinson was in fact deterred. *See Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012) (deterrence for a retaliation claim "is an objective inquiry").

[118] 42 U.S.C. §§ 12131–65.

[119] 42 U.S.C. § 12132; *see also Disability Rights N.J., Inc. v. Comm'r, N.J. Dep't of Human Servs.*, 796 F.3d 293, 301 (3d Cir. 2015) (citing *Tennessee v. Lane*, 541 U.S. 509, 517 (2004)).

[120] *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998).

prohibits discrimination by entities receiving federal funding.[121] "When a public entity . . . is sued under Title II, the entity is vicariously liable for the acts of its employees."[122] The Court will refer solely to the ADA in addressing Robinson's claims under both the ADA and RA.

To establish a claim under the ADA, a plaintiff must show that he is: (1) a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability.[123] If a plaintiff seeks compensatory damages, as Robinson does here, he "must also show intentional discrimination under a deliberate indifference standard."[124] To show deliberate indifference for purposes of an ADA claim, a plaintiff must present evidence of: "(1) knowledge that a federally protected right is substantially likely to be violated . . . , and (2) failure to act despite that knowledge."[125]

    1.  <u>Exhaustion</u>

The Prison Litigation Reform Act ("PLRA") requires a plaintiff inmate to exhaust the administrative remedies available to him before bringing any action under federal law, including the ADA and RA.[126] "[E]xhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge"[127] and requires "'substantial' compliance with the prison's

---

[121] *Yeskey v. Pa. Dep't of Corr.*, 118 F.3d 168, 170 (3d Cir. 1997).

[122] *Waters v. Amtrak*, 456 F. Supp. 3d 666, 671 (E.D. Pa. 2020) (citations omitted). The Third Circuit has also held that "state officers can be sued for damages in their official capacities for purposes of the ADA and RA, unless barred by the Eleventh Amendment." *Durham v. Kelley*, 82 F.4th 217, 224 (3d Cir. 2023) (citing *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001)). The Third Circuit confirmed in *Durham v. Kelley* that the ADA validly abrogates state sovereign immunity under section 5 of the Fourteenth Amendment where, as here, a plaintiff pursues relief for an actual violation of the Eighth Amendment (which independently violates the substantive provisions of the Fourteenth Amendment). 82 F.4th at 228–29.

[123] *Durham*, 82 F.4th at 225 (citing *Haberle v. Troxell*, 885 F.3d 170, 178 (3d Cir. 2018)).

[124] *Durham*, 82 F.4th at 225 (citing *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 289 (3d Cir. 2019)).

[125] *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 265 (3d Cir. 2013).

[126] 42 U.S.C. § 1997e(a); *see also Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020).

[127] *Drippe v. Tobelinski*, 604 F.3d 778, 782 (3d Cir. 2010).

grievance procedures."[128] "If there is no genuine dispute of material fact, then the exhaustion defense may be evaluated as a matter of law at summary judgment. If there is a genuine dispute of material fact related to exhaustion, then summary judgment is inappropriate . . . ."[129]

The DOC's primary argument in support of summary judgment is that Robinson failed to exhaust all administrative remedies available to him regarding his disability discrimination claims under the ADA and RA.[130] The DOC states that it has promulgated Policy No. DC-ADM 006, Section 2A of which provides that "[a]n inmate seeking an accommodation for a disability shall submit to the Corrections Health Care Administrator . . . a request using the Inmate Disability Accommodation Request Form . . . ."[131] Robinson responds that he did submit a request form pursuant to DC-ADM 006, a copy of which is attached to his response to the DOC's motion.[132] The DOC strongly contests the authenticity of the form.[133] The Court need not determine here whether the request form Robinson submitted is authentic—setting aside that it would be inappropriate for the Court to resolve what appears to be a genuine factual dispute at the summary judgment stage—because Robinson has produced evidence showing that he submitted and fully appealed a request for a wheelchair against Sergeant Jenkins and a DOC Unit Manager pursuant to Policy No. DC-ADM 804, the DOC's general grievance policy.[134]

---

[128] *Small v. Camden County*, 728 F.3d 265, 272 (3d Cir. 2013) (citations omitted).

[129] *West v. Emig*, 787 F. App'x 812, 814 (3d Cir. 2019).

[130] DOC's Mot. Summ. J. at 5–7 [Doc. No. 74]; DOC's Reply Supp. Mot. Summ. J. at 2 [Doc. No. 80].

[131] DOC's Mot. Summ. J., Ex. A, at ECF p. 14 [Doc. No. 74-1] (DOC Policy No. DC-ADM 006).

[132] Pl.'s Resp. Opp'n DOC's Mot. Summ. J., Ex. 4, at 2 [Doc. No. 77-4] (Accommodation Request Form).

[133] Fackler Decl. at 3 [Doc. No. 74-1] (noting that the March 5, 2018 date handwritten at the top of the form appears above a crossed-out original date, there are no signatures from the DOC designates responsible for processing such requests, and the DOC has no records of anyone having ever received or reviewed such a request from Robinson during the six-month period he was without his wheelchair).

[134] DOC's Mot. Summ. J., Ex. E, at 1–6 [Doc. No. 74-3] (Grievance #703294 against U/M Felice and Sergeant Jenkins, initial decision, and appellate record); *see also* Pl.'s Resp. Opp'n DOC's Mot. Summ. J., Ex. 3, Robinson Dep. Tr. 96:15–22 [Doc. No. 77-3] ("Q. Did you ever file a grievance against Sergeant Jenkins for taking your wheelchair . . . ? A. . . . Yeah, there was one filed against him for ADA violation that resulted in me being denied the

The DOC cites a Third Circuit decision for the proposition that an inmate who fails to file an Accommodation Request Form pursuant to DC-ADM 006 has failed to exhaust his administrative remedies. However, that case, *Zamichieli v. Pennsylvania Department of Corrections*, affirmed the district court's finding of a failure to exhaust only because the plaintiff "did not submit a formal request for accommodation pursuant to . . . DC-ADM 006, . . . *nor* an official grievance pursuant to PA DOC's general grievance policy, DC-ADM 804 . . . ."[135] The PLRA's exhaustion requirement demands only "substantial" compliance with a prison's grievance procedures,[136] and "a prison grievance system's procedural requirements [must] not be imposed in a way that offends the Federal Constitution or the federal policy embodied in § 1997e(a)."[137] Given that the wheelchair was discontinued by formal order from SCI-Greene's medical staff after multiple appointments, it would have been futile for Robinson to pursue yet another avenue of administrative review by filing an Accommodation Request Form after his grievance had been fully exhausted.[138] The Court holds that Robinson sufficiently exhausted his administrative remedies for purposes of bring his present ADA and RA claims against the DOC.

---

wheelchair."); *id.* at 97:12–13 ("A. Yes. The number of it is 703294. And it was filed on 10-24-17 . . . ."); *id.* at 107:15–19 ("Q. Okay. To your knowledge, what was the result of your grievance against Sergeant Jenkins? . . . A. They denied that one . . . .").

[135] *Zamichieli v. Pa. Dep't of Corr.*, No. 19-3305, 2022 WL 777201, at *2 (3d Cir. Mar. 14, 2022) (non-precedential) (emphasis added).

[136] *Spruill*, 372 F.3d at 232 (quotation marks omitted) (quoting *Nyhuis v. Reno*, 204 F.3d 65, 77–78 (3d Cir. 2000)).

[137] *Spruill*, 372 F.3d at 232.

[138] According to a declaration from the DOC's representative, once an inmate submits an Inmate Disability Accommodation Request Form under DC-ADM 006, it is reviewed by a Corrections Health Care Administrator ("CHCA"), who refers his or her evaluation to the Facility Manager, who then submits a recommendation to the Central Office Inmate Disability Accommodation Committee ("COIDAC"). Fackler Decl. at 2 [Doc. No. 74-1]. At the initial review stage, the CHCA must "arrange for a current clinical evaluation of the inmate's alleged disability and/or impairment by a medical practitioner in order to validate the accommodation request . . . ." DOC's Mot. Summ. J., Ex. A, at ECF p. 14 [Doc. No. 74-1]. If an inmate is dissatisfied with COIDAC's determination on appeal, he is directed to "submit a grievance under Department policy DC-ADM 804 . . . ." *Id.* at ECF p. 15.

At the time he filed Grievance #703294 pursuant to DC-ADM 804, Robinson had already received a clinical evaluation from several providers—including Dr. Smyth, the Medical Director at SCI-Greene—and his wheelchair access had been formally discontinued by order of the medical staff. On initial review, a grievance coordinator

2.   <u>Challenge to DOC Accommodation Policy / Punitive Damages</u>

The DOC contends that Robinson cannot raise a challenge to its accommodation policy because such a claim would be one seeking equitable relief, and the Amended Complaint seeks only monetary damages. The DOC also asserts that Robinson's wheelchair has been returned, therefore he no longer has standing to sue for an injunction. The Court agrees with both arguments. The Amended Complaint, by its plain language, seeks only compensatory damages, punitive damages, and attorney's fees.[139] If Robinson were to succeed in his challenge to the DOC's accommodation policy, the available relief would necessarily be injunctive (and therefore prospective in nature), whereas damages are a retrospective remedy. Moreover, even if Robinson were to be pursuing injunctive relief in this case, his claim is subject to dismissal under the mootness doctrine because all parties agree that Robinson's access to a wheelchair has been restored and he continues to use one daily.[140] The Court will dismiss Robinson's challenge to the DOC's accommodation policy for lack of jurisdiction.[141]

---

denied Robinson's request pursuant to the medical department's order; the Facility Manager affirmed; and SOIGA, in its final denial on March 8, 2018, did not instruct Robinson to submit an Accommodation Request Form if he was dissatisfied, but rather "encouraged [him] to sign up for sick call to have [his] concerns addressed with medical staff." DOC's Mot. Summ. J., Ex. E, at 1, 3, 5 [Doc. No. 74-3]. The Court is not persuaded that the PLRA required Robinson to do more. *See Ross v. Blake*, 578 U.S. 632, 643 (2016) (holding that an administrative procedure must be "available"—*i.e.*, it must provide the possibility of relief and a real chance of success).

[139] Am. Compl. at 14–15 [Doc. No. 60].

[140] *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013) ("There is thus no case or controversy, and a suit becomes moot, 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013))).

[141] *See Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) ("[S]tanding is a jurisdictional matter."); *Steele v. Blackman*, 236 F.3d 130, 134 n.4 (3d Cir. 2001) (holding that courts are "required to raise issues of standing sua sponte if such issues exist" (citation omitted)). The Court notes that Robinson's challenge to the DOC's policy was raised for the first time in his Amended Complaint, which was filed after the Court's adjudication of the parties' motions to dismiss on Robinson's initial *pro se* Complaint.

Additionally, the DOC correctly argues that punitive damages are unavailable under the ADA.[142] The Court will grant summary judgment in favor of the DOC to the extent that Robinson seeks punitive damages on his ADA claim.

### 3.   Qualified Individual

The Court now considers the substantive elements of Robinson's claim under the ADA based on the confiscation of his wheelchair. For purposes of its present motion, the DOC does not contest that Robinson has a disability under the second element.[143] Rather, it summarily disputes the first element, on the basis that Robinson was not a "qualified individual" because he was approved for the use of a cane. The DOC misunderstands this element. The Supreme Court has held that a state prisoner is a "qualified individual" under the ADA, which defines the term to include anyone with a disability who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."[144] Whether Robinson was issued a cane is irrelevant to his eligibility for, *e.g.*, accessing the prison law library.[145] The DOC's cursory argument as to the first element is without merit.

### 4.   Excluded from Services, Programs, or Activities By Reason of Disability / Deliberate Indifference

The Court considers the remaining elements together, including the showing of deliberate indifference required for compensatory damages under the ADA. The DOC contends that Robinson has failed to present sufficient evidence on the third and fourth elements. Specifically, the DOC contests Robinson's "claims he was denied use of the showers and law library at SCI

---

[142] *Barnes v. Gorman*, 536 U.S. 181, 189 (2002).

[143] DOC's Mot. Summ. J. at 1 n.2, 8 [Doc. No. 74].

[144] *Yeskey*, 524 U.S. at 210 (quotation marks omitted) (quoting 42 U.S.C. § 12131(2)).

[145] *See Yeskey*, 524 U.S. at 211.

Greene" because "there is no record evidence of this."[146] Moreover, the DOC asserts that there is no genuine dispute as to whether the DOC's officers were deliberately indifferent to Robinson's needs, because its correctional officers deferred to the medical judgment of the providers who treated him, and such officers are "not qualified to second-guess—let alone overrule—[the] medical judgment" of health care providers.[147] The DOC cites Robinson's testimony during his deposition that he did not name any individual correctional officers as defendants in his initial Complaint "because they were told to do that by medical staff . . . ."[148]

"Deliberate indifference requires actual knowledge . . . ."[149] The Third Circuit has made clear that non-medical prison officials cannot be said to be deliberately indifferent to an inmate's medical needs "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner . . . ."[150] Therefore, Robinson must point to evidence showing that the DOC's officials actually knew that Robinson's federally protected rights under the ADA were substantially likely to be violated when his wheelchair was taken away—*i.e.*, knowledge that Robinson would likely be unable to use the toilet, access showers, visit the law library, or enjoy the prison yard without a wheelchair—and that those officials nevertheless failed to act in the face of that knowledge. Moreover, because Robinson was actively being treated by the medical staff, he must cite evidence that the prison officials knew the treatment he was receiving was inadequate or was driven by improper motivations.

---

[146] DOC's Mot. Summ. J. at 2 [Doc. No. 74].

[147] DOC's Mot. Summ. J. at 9 [Doc. No. 74] (citing *Durmer*, 991 F.2d at 68).

[148] Pl.'s Resp. Opp'n DOC's Mot. Summ. J., Ex. 3, Robinson Dep. Tr. 98:5–9 [Doc. No. 77-3].

[149] *S.H. ex rel. Durrell*, 729 F.3d at 266 n.26 (emphasis omitted).

[150] *Spruill*, 372 F.3d at 236 (defining parameters of deliberate indifference requirement in Eighth Amendment context); *see also S.H. ex rel. Durrell*, 729 F.3d at 263 n.23 (holding that the "definition of deliberate indifference in the RA and the ADA context is consistent with [the] standard of deliberate indifference in the context of § 1983 suits by prison inmates," including under the Eighth Amendment).

Robinson has satisfied that threshold. He has identified ample supporting evidence, including his own deposition testimony, declarations from witnesses, and his own medical records (discussed at length throughout this Memorandum Opinion), which create a genuine dispute as to whether Sergeant Jenkins and other correctional officers knew both that Robinson could not walk without assistance and that the wheelchair was taken away for improper and non-medical reasons. Accordingly, the Court will deny summary judgment as to Robinson's ADA claim based on the confiscation of his wheelchair.

## IV. CONCLUSION

For the reasons stated herein, the Medical Defendants' motion for summary judgment will be granted in part and denied in part, and the DOC's motion for summary judgment will be granted in part and denied in part. An appropriate order follows.